[Civ. No. 22873. First Dist., Div. One. Aug. 4, 1966.]

EMPLOYEES SERVICE ASSOCIATION, Plaintiff and Appellant, v. STAFFORD R. GRADY, as Insurance Commissioner, etc., Defendant and Respondent.

[Civ. 22873. First Dist., Div. One. Aug. 4, 1966.]

ASSOCIATION GROUP INSURANCE ADMINISTRA-TORS et al., Plaintiffs and Appellants, v. STAFFORD R. GRADY, as Insurance Commissioner, etc., Defendant and Respondent.

(Consolidated Cases.)

820

Thomas P. Brown, Jr., James T. Davis and Donald D. Paul for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, and Robert E. Murphy, Deputy Attorney General, for Defendant and Respondent.

McFarland & Ferdon and John P. McFarland as Amici Curiae on behalf of Defendant and Respondent.

SIMS, J.—Appellants have appealed from judgments of the superior court which set aside, vacated and dismissed alternative writs of mandate, denied their respective petitions for a peremptory writ of mandate, decreed that they take nothing by the respective parties against respondent Insurance Commissioner of the State of California in which they sought review, rescission and revocation of his order affecting certain selected group disability insurance and their respective interests therein, and awarded respondent his costs.

The controversy revolves around the construction of the provisions of section 10270.97 of the Insurance Code[1] which

---

[1]Insurance Code section 10270.97 provides: ''Selected group disability insurance is that form of disability insurance conforming to the following conditions: (a) Written under individual policies (1) Issued to not less than five employees of the federal or state government, or of any federal or state agency, political subdivision or district, or of any public, governmental, or municipal corporation, or of any unit, agency, or department thereof, or of any corporation, copartnership or individual employer; or (2) Issued to not less than 10 members of any association, which shall have been in existence for at least two years, having a constitution and bylaws and formed *and continuously maintained* in

permit insurers to give preferential rates for disability insurance written under individual policies issued to members of an association which qualifies under those provisions. The parties have stipulated as follows: "The sole questions to be resolved by the appeal are the construction, interpretation, application and constitutionality of Insurance Code section 10270.97 and the orders of respondent, dated May 6, 1964, and June 4, 1964, and whether or not respondent's said Orders are supported by the law and competent evidence and whether or not Employees' Service Association, one of the petitioners, has been maintained in compliance with this section."

This stipulation recites that one issue is whether the Insurance Commissioner's order is supported by competent evidence. Nevertheless, the parties have recognized that since the order which was reviewed by the superior court was that of a statewide administrative agency without judicial powers, the proper question on appeal is whether there is substantial evidence to support the trial court's findings, on its independent review of the evidence, which upheld the respondent's order. (*Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308-309 [196 P.2d 20]; *Hohreiter* v. *Garrison* (1947) 81 Cal. App.2d 384, 401-402 [184 P.2d 323]; 3 Witkin, Cal. Procedure, (1954) at p. 2489.)

### Statutory and Procedural Background

Since 1917 (Stats. 1917, ch. 614, § 14, p. 965) it has been a misdemeanor for any insurer or agent to make or permit discrimination in relation to disability insurance. Section 10401 of the Insurance Code (Stats. 1935, ch. 145, § 10401, p. 651) provides: "Any incorporated insurer admitted for disability insurance and any agent of such insurer, that makes or permits discrimination between insureds of the same class in any manner whatsoever with relation to such insurance, is guilty of a misdemeanor." Thereafter, provision was made for

good faith for purposes other than that of obtaining insurance; (3) For amounts of insurance based upon individual selection by the insured employee or member, as the case may be; and (4) Maintained in force under an arrangement whereby the premiums on such policies are to be paid to the insurer either by means of payroll deductions or periodically by the employer or association, as the case may be, or by some designated person acting on behalf of such employer or association. (b) Notwithstanding the provisions of Section 10401 insurers may be permitted to file (for use in connection with selected group disability insurance), rate schedules that reflect a differential from the rates charged for identical policies issued on the individual basis, provided they do not make or permit any discrimination between selected groups." (Adopted Stats. 1945, ch. 769, § 1, p. 1453, and amended by the addition of the italicized words Stats. 1961, ch. 2230, § 2, p. 4589.)

group insurance written under a master policy. (Ins. Code, §§ 10270.5, 10270.55, 10270.6, 10270.9, 10270.94, and for family expense disability insurance (*id.*, §§ 10270.7, 10270.8) which were exempted from the foregoing provision. In 1944 the Attorney General ruled that the issuance of special benefits to holders of individual disability policies who were members of particular professional societies, such as a local bar association, would violate the anti-discrimination statute. (Op. NS-5545, Oct. 2, 1944; 4 Ops. Cal. Atty. Gen. 231.) Section 10270.97 in its original form was adopted at the next session of the Legislature. (See fn. 1.)

Records filed with the Secretary of State, April 8, 1959, reflect that on March 19, 1959, the articles of incorporation of Solano Eagles Motorcycle Club[2] were amended to change the name of the corporation to Employees Service Association, and the purposes of the corporation were stated as follows: "The specific and primary purposes for which this corporation is formed are to advise and counsel the members on matters of mutual benefit and interest in social, economic, and political affairs. The general purposes of said corporation shall be: (a) To support such charitable endeavors as the board of directors shall from time to time determine; (b) To make contracts; and to do all other acts necessary or expedient for the administration of the affairs and the attainment of the purposes of the corporation; and (c) To convey, exchange, lease, mortgage, encumber, transfer upon trust, or otherwise dispose of all property, real or personal." Restated articles, embodying the above, were adopted April 10, 1959, and filed June 3, 1959; by amendment adopted April 15, 1959, and filed July 27, 1959, there was added to the foregoing a provision reading: "In the event this corporation is ever dissolved its assets are to be turned over to an organization with similar purposes."

The renamed corporation, hereinafter referred to as "the association," among other things, arranged for selective group insurance for its membership which grew from 4 on March 19, 1959, to 4,812 by July 26, 1962.

In 1961 the statute in question and the provisions for group insurance under a master policy were both amended by the addition of the qualifying phrase "and continuously maintained" to the required characteristics of an association which, or the members of which, would be eligible for special

---

[2]According to correspondence with the United States Treasury Department this corporation was incorporated May 16, 1950.

rates. (Stats. 1961, ch. 2230, §§ 1 and 2, pp. 4587-4589, and see fn. 1.)

On February 18, 1964, respondent commissioner issued his order for an investigatory hearing concerning the operations of the association.[3] No notice of hearing was given to any of the interested parties, nor was there any thought of, or attempted compliance with the provisions of those sections of the Government Code (ch. 5, pt. 1, div. 3, tit. 2, §§ 11500-11528) sometimes referred to as the Administrative Procedure Act. Sections 704 and 1738 of the Insurance Code require that proceedings be conducted under that act where the commissioner proposes to suspend the certificate of authority of an insurer or to suspend or revoke the license of an agent or broker. (See *National Auto. & Cas. Ins. Co.* v. *Downey* (1950) 98 Cal.App.2d 586, 589-591 [220 P.2d 962].) The instant proceedings, however, were apparently commenced under the general investigative powers of the commissioner as a corollary to his duties to enforce the execution of the code provisions and other laws regulating the business of insurance (Ins. Code, § 12921), and to require from every insurer a full compliance with all the provisions of this code (*id.*, § 12926); and they were held pursuant to his power to compel witnesses to attend and testify before him on any subject touching insurance business or in aid of his duties (*id.*, § 12924).

In the same stipulation referred to above the petitioners waived as ground for appeal any alleged denial of procedural due process with reference to the adequacy of notice of hear-

---

[3]This order recites: ''WHEREAS, the INSURANCE COMMISSIONER of the State of California has received information concerning the operations of EMPLOYEES SERVICE ASSOCIATION, based upon which he believes that there is doubt as to whether said Employees Service Association now is and has been since its organization continuously maintained in good faith for purposes other than insurance, as is required by Section 10270.97 (a) (2) of the California Insurance Code in order that members of such Association may lawfully be eligible to have issued to them disability insurance policies at rates which would otherwise be unlawfully discriminatory in violation of Section 10401 of said Insurance Code; and

''WHEREAS, said Insurance Commissioner has determined that it is necessary to obtain the testimony under oath of persons closely associated with said Association in order to find the fact as to whether said Association is and has been so continuously maintained in good faith for purposes other than Insurance;

''Now THEREFORE, Pursuant to the authority conferred upon me by Section 12924 of said Insurance Code, and in aid of my duties as aforesaid, it is hereby

''ORDERED that on the 18 day of March, 1964, commencing at the hour of 10:00 o'clock a.m., Room 307, 1407 Market Street, San Francisco, California, an Investigatory Hearing will be held, at which persons are subpoenaed will be required to attend and testify under oath before my duly constituted Deputy relating to the aforesaid matter; and . . .''

ing of the hearings which were held before the Insurance Commissioner and resulted in the order of which complaint is made, or in the manner in which such proceedings were conducted, or the manner of taking testimony in connection with such hearings.[4] It is, therefore, unnecessary to dwell further on the procedural aspects of the case before the commissioner.

Hearings were held on March 18 and April 3, 1964, before the Deputy Insurance Commissioner appointed for that purpose, and the evidence hereinafter reviewed was received from seven witnesses including the organizer, the president, and the secretary of the association, and voluminous files of the association were presented. After submission the commissioner issued a letter under date of May 6, 1964, directed to Coastal Casualty Company, the underwriter of the policies issued to members of the association. It concluded that since the association "has not been maintained in good faith for purposes other than obtaining insurance, its continued existence as a vehicle for selected group insurance under Section 10270.97 of the California Insurance Code must cease." It ordered Coastal to terminate its contracts with members of the association by notices mailed before July 15, 1964.

The letter further recites: "It necessarily follows that it would be equally unlawful for insurers other than Coastal Casualty Company to provide selected group insurance on the basis of membership in Employees Service Association. Therefore, neither Coastal Casualty Company, Employees Service Association, nor the officers, employees, agents or directors, of either of them, nor any insurance agent, broker, or solicitor or any group administrator or consultant, whether they, or any of them have heretofore had any function or connection relating to the selected group disability insurance program for E.S.A. or its members or not, shall refrain from [sic] any acts or attempts to transfer the selected group program to an insurer other than the Coastal Casualty Company, or to continue the program in any other manner with another insurer or otherwise." (The parties agree that the double negation from the use of "neither," "nor" and "shall refrain from" is a clerical error, and that the true intent of the order is to prohibit those mentioned from committing any of the proscribed acts.) Copies of the letter were sent to the association

---

[4]The petitioners at no time requested the superior court to open up the proceedings to hear further evidence or to permit cross-examinat'on of those witnesses who testified at the hearing. (Cf. Code Civ. Proc., § 1094.5, subd. (d).)

and to the president of the corporation, which was the exclusive broker for the insurance in question, and who as an individual was one of the two persons who were joint agents of the association as set forth below.

On May 22, 1964, Association Group Insurance Administrators, a California corporation, James B. Wigle and Thomas C. Blake, filed their petition for a writ of mandate in the superior court seeking rescission and revocation of the order of May 6, 1964. On May 25th a similar petition was filed on behalf of the association. By amendment the status of the first petitioners as agent and administrators of the insurance plan was alleged. The record reflects that by contract dated January 12, 1964, the association irrevocably appointed Association Group Insurance Administrators, hereinafter referred to as broker, its exclusive broker of record of and for any and all plans of selected group disability insurance which were then or might become available to members of the association. Under this contract the broker was to receive the applicable sales commissions from the company which furnished the coverage. On the same day the association entered into a contract with Wigle and Blake whereby they were irrevocably appointed agents to bill and collect premiums and to pay over the sums collected to the insurer and the broker entitled to commissions. They also undertook to collect the membership dues, specified as $7 the first year for a new member, and $2 each succeeding year. They agreed to remit to the association $2 for each dues payment collected and an additional sum of $50 per month. In return they were authorized to charge the members and retain the sum of 60 cents per month for each member, and to retain $5 from the $7 first dues payment.

The association's petition was amended to bring in as a copetitioner, Thomas P. Brown, Jr., who the record reflects was one of the four members of the association on March 19, 1959, and who will hereinafter be referred to as member.

Coastal Casualty Company, to whom the order was addressed, has never, so far as appears, questioned the propriety of the order, nor has it appeared in these proceedings. At the threshold, therefore, a question suggests itself as to the status of the petitioners to seek relief. It has been suggested that the petitioner has no standing to seek review of the order where the administrative order is not being enforced against him, and he has not been a party to the proceedings before the administrative agency. (See *Western Surgical Supply Co.* v. *Affleck* (1952) 110 Cal.App.2d 388, 391 and 393 [242 P.2d

929].) ■ The provisions of section 1094.5 of the Code of Civil Procedure, upon which review may be predicated, refer to "any final administrative order or decision made as the result of a proceeding in which by a law a hearing is required to be given," and, as in the case of an application for a writ under the provision of section 1085 of that code, the petitioner must show he is a "party beneficially interested" as required by section 1086 (*Grant* v. *Board of Medical Examiners* (1965) 232 Cal.App.2d 820, 826-827 [43 Cal.Rptr. 270]). Do the parties mentioned in the order have to await injunction proceedings by the commissioner (Ins. Code, § 12928.6), or, in the case of a licensee, proceedings for the suspension or revocation of his license (*id.*, § 1738)?

The order here is couched in the language similar to that found in section 12928.5 of the Insurance Code which empowers the commissioner to cancel insurance under certain circumstances where facts exist authorizing action under sections 704 or 1738.[5]

Section 12940 of the Insurance Code provides: "The acts and orders of the commissioner are subject to such review, or other action by a court of competent jurisdiction, as is permitted or authorized by law." These provisions leave open the questions of by whom, when, and in what proceedings such review may be obtained. ■ It is clear that where a party has a beneficial interest in the subject matter of the proceed-

---

[5]Section 12928.5 of the Insurance Code provides: "Whenever facts exist by reason of which, under any provision of this code, or other laws the commissioner may suspend, revoke, or deny any license or certificate of authority granted under any provision of this code, if the making or maintenance in force of a contract of insurance is one of the circumstances out of which such facts arise, or if, by reason of the existence of such facts, or in connection therewith a contract of insurance is made or maintained in force, the commissioner may, in lieu of or in addition to, such suspension, revocation or denial of license or certificate, by order require the immediate cancellation of such contract, unless such contract, by its terms, is not subject to cancellation by the insurer and the insured did not knowingly participate in such wrongful acts.

"The commissioner may also, in any such case, notify the insured, stating the reason why such cancellation was required.

"In any such case, whether or not the particular contract is thus required to be canceled or is subject to such cancellation, the commissioner may order the insurer, insurance agent, broker, solicitor, surplus line broker, or life agent soliciting, negotiating, or effecting such insurance to refrain from effecting insurance upon the property, risk, or insured under such contract for not exceeding five years from the date of the order.

"The commissioner may suspend or revoke, or deny an application for, any license or certificate of authority granted under any provision of this code to any applicant or licensee violating any order issued by him pursuant to this section."

ings and a right to appear, and has appeared before the administrative agency he properly may institute proceedings for review by mandamus. (*Temescal Water Co.* v. *Department of Public Works* (1955) 44 Cal.2d 90, 107 [280 P.2d 1].) The insurer, whose business is threatened would also appear to have a right to relief. (See *B. C. Turf & Country Club, Ltd.* v. *Daugherty* (1949) 94 Cal.App.2d 320, 333 [210 P.2d 760].) There is also precedent for the proposition that where the petitioner shows ''his business operations are inextricably interwoven'' in the threatened conduct he may have status to sue. (*Atlas Hotels, Inc.* v. *Acker* (1964) 230 Cal.App.2d 658, 660 [41 Cal.Rptr. 231]; and see *Gowens* v. *City of Bakersfield* (1960) 179 Cal.App.2d 282, 285 [3 Cal.Rptr. 746], each involving status of a hotel owner to attack a proposed tax on lodging rentals.)

This point was not urged by respondent below in either proceeding. There is evidence to show that each of the petitioners has a beneficial interest in the threatened contracts. The parties having litigated the issue, and stipulated to the issues on appeal, there is no purpose in questioning the form of action or the finality of the order at this stage of the proceedings. The question may be left open for other cases where properly raised, and this opinion may proceed to the merits.

### The Construction of the Statute

The respondent, as noted above, couched his conclusions in the phraseology of the statute. The trial court, in its consolidated findings of fact and conclusions of law, made a conclusion of law reading as follows: ''The meaning and intent of Insurance Code section 10270.97, as amended, is that in order for the members of an association to be eligible for the availability of selected group disability insurance, such association shall, among other things, be formed and continuously maintained in good faith for *dominant* purposes other than that of obtaining insurance.'' (Italics added.)

Petitioners assert that the statute: must be construed as written; that it is improper to insert words; that the insertion of the word ''dominant'' renders the statute uncertain and vague. The authorities cited are determinative of the situations with which they are involved and good precedents for the rules laid down. They do not, however, indicate whether those rules should be applied in this case. They may well be compressed into the provisions of section 1858 of the Code of Civil Procedure, which provides as follows: ''In the construction of

a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.''

■ In determining what is in terms or in substance contained in the statute consideration should be given to its purpose. Petitioners refer to the Legislative Council's Digest which was appended to Assembly Bill 1531 as of February 9, 1961. It recites: ''Specifies that to be entitled to have a group disability policy issued to it, an association must not only have been formed for some purpose other than that of obtaining insurance, but must have been continuously maintained for some purpose other than that of obtaining insurance.'' At the time the foregoing was written the bill was designed to amend section 10270.5 which relates to group insurance written under a master policy. Subsequently it was amended to add the same language to section 10270.97. In interpreting the statute as amended there is an apt admonition from an opinion of the Attorney General which construes a provision of section 10270.97. It reads: ''In examining this legislative history with your problem in mind, it must therefore be understood that in determining whether or not a disability coverage may be written as 'group,' and in determining the permissibility of certain practices in connection with that form of policy, we are prescribing the extent to which insureds are withdrawn from the protection of the anti-discrimination law, or are favored by exemption therefrom.'' (Op. No. 46-76, March 25, 1946, 7 Ops. Cal. Atty. Gen. 192 at p. 194.)

■ There is an important underwriting consideration in the insurance under a master policy where the insurance covers all of the group without any selection of risk. If it is formed primarily for the purpose of securing group insurance it may well attract an undue proportion of undesirable risks.[6]

---

[6]''Groups formed primarily for the purpose of securing group insurance are not likely to be good risks . . . . [S]ince the charge for each member tends to approximate the average cost for the group, the charge appears excessive to the younger, healthier members. This causes them to drop out, thereby increasing the average cost and making it still more difficult to attract the best risks. It has, therefore, been found to be an essential element of group underwriting that the members of the group have some other strong incentive for joining and remaining in the group which will overshadow the value of the insurance.'' (Shepherd & Webster, Selection of Risks (1957) pp. 292-293; see also Huebner & Black, Life Insurance (6th ed. 1964) p. 488; and McGill, Life Insurance (1964) p. 665.)

If the legislation is designed to obviate the evils of selecting a group of undesirable risks and the ensuing threat to the solvency of the insurer it is important that the legislation be given a strict construction, and the "purpose" whether it stand alone or be designated "some purpose" must be substantial enough to overcome the evil which the Legislature sought to avoid by the qualifying language.

The insurance in question here, however, is written under individual policies, which implies that the insurer may reject the application of any uninsurable member of the group. Moreover, each individual applying as a member of a qualified association is free to select the amount of insurance he wishes. Objections predicated upon lack of selectivity of risk for the insurer, or inflexibility of the plan for the insured do not appear pertinent. The purpose of selected group disability insurance is to take advantage of the collective market offered by the association, and to pass on to the members thereof through wholesale rates the savings in sales efforts.[7]

With these considerations in mind it would appear that the dominant purpose of section 10270.97 was to overcome the prohibition suggested in the Attorney General's 1944 opinion, and make the benefits of wholesale rates available to the purchaser of insurance.

The Legislature, however, did not go so far as to allow such plans to flourish without restrictions. Whether out of consideraton for the views of the California Association of Life Underwriters,[8] who have appeared herein as amicus curiae in

[7] "Essentially, franchise insurance is the sale of individual policies on a mass-selling basis. There is no master or over-all contract as there is in group and blanket insurance. Instead, the contract is made between the insurance company and the individual insured. The difference between this and an ordinary individual contract, other things being equal, is that in the case of franchise insurance the insured person is a member of a group which exists for purposes *other* than that of obtaining insurance, and which constitutes a central means by which the administrative costs of the insurance can be reduced." (Angell, Health Insurance (1963) p. 381; and see MacLean, Life Insurance (9th ed. 1962) p. 372; Mehr & Cammack, Principles of Insurance (1957) p. 538.)

[8] "The fact that more types of groups are eligible for coverage in some states than in others reflects, to some extent, the varying degrees of strength of the life underwriter's (agents') associations in these states. Organized life insurance agents seek to contain group insurance. They see in its expansion a serious threat to their markets. The absence or presence of legislative pressure groups on behalf of potential group buyers also accounts for the variations in eligibility requirements.

"Some individual agents and the life agent's association are active in fostering or protecting legislation which keeps group life from expanding further into dependent's coverage, high individual limits, and association fields." (Mehr & Osler, Modern Life Insurance (3d ed. 1961) pp. 279, 280, 305.)

support of respondent, or out of a belief that sound underwriting practices require some restraints to provide (1) that there is some common characteristic in the composition of the group approached other than a desire for insurance, (2) that there be some assurance that underwriting costs will really be reduced, or (3) that there be some provision freeing the insurer from the burden of collecting premiums, the fact remains that restrictions do exist in the statute.

Respondent urges that since anti-discrimination policy (§ 10401) is the rule, and selective group insurance (§ 10270.97) is the exception, the latter statute should be given a strict construction. ■ "The purpose of statutes prohibiting discrimination is to promote solvency by uniform rates, and to give equality to the cost of insurance and equal opportunity to solicitors." (5 Couch, Insurance (1960) at p. 565; and see 12 Appleman, Insurance Law and Practice (1943) § 7017, p. 47.) This argument may well apply within any class of applicants. ■ The statute in question, however, does not purport to countenance discrimination between applicants of the same class, but recognizes that in certain situations there may be economies which should be passed on to all applicants of a class entitled to those savings. The exception provided by section 10270.97 should be limited to the situations which it approves, but in determining what those situations are consideration should be given to the fact that it countenances legitimate savings and not discrimination.

■ It is concluded that because of a similarity of language between sections 10270.5, subdivision (a), paragraph (3), and paragraph (2) of subdivision (a) of section 10270.97, and the contemporaneous amendment of each in 1961, that the Legislature intended more than nominal consideration be given to the phrase "continuously maintained in good faith for purposes other than that of obtaining insurance."

■ No warrant is found for rewriting the statute by the insertion of the word "dominant," but it is recognized that consideration of the dominant purpose of the association is a consideration of weight in determining whether there has been compliance "in good faith" with the statutory mandate in either the formation or maintenance of the association.

■ The foregoing conclusion of error is not determinative of the case. It is clear from the consolidated findings of fact and conclusions of law that the trial court in the exercise of its independent judgment on the evidence determined that

the Insurance Commissioner's findings of fact contained in his order of May 6, 1964, are supported by the weight of the evidence. The findings of fact so recite. If these findings compel the conclusion that the association is not qualified, the judgment of the trial court sould be affirmed regardless of its redundant erroneous conclusions as to the meaning and intent of the statute.

## The Sufficiency of the Evidence

The two petitions first came on for hearing on respondent's demurrers. Amendments were filed, the demurrers were overruled and the matter was submitted on the record made before respondent with leave to the parties to file briefs. At a subsequent hearing a motion to consolidate the proceedings was granted. At a final hearing the consolidated findings of fact and conclusions of law, which had been approved as to form, were signed and filed; and the parties signed and filed a stipulation which, in addition to the matters hereinabove mentioned, provided for a stay of the order of May 6, 1964, and a subsequent letter of June 4, 1964, denying reconsideration.

Preliminarily petitioners object to consideration of the circumstances under which the association was activated under a new name in 1959, and which have been alluded to by respondent as the formation of the association. They state that the association was formed years before that date, that the commissioner acquiesced in the manner in which the association was conducted for over two years after the change of name, and that the proceedings, as set forth in the commissioner's order, were limited to the issue of whether the association was continuously maintained in good faith for purposes other than that of obtaining insurance.

It is unnecessary to determine whether the severe wrench in the corporate name and purposes which occurred in 1959 was the formation of an association within the meaning of section 10270.97. That issue was not raised and it has been assumed throughout and apparently was acknowledged by the deputy commissioner conducting the hearing that the prior life of the association under its former name satisfied the provisions of the statute which require two years existence before eligibility may accrue under the section. No opinion is expressed herein on the validity of that assumption.

It is also true that the respondent's investigation was limited to the issue of the manner in which the association was maintained. The stipulation refers to the manner in which the association was maintained and not to its formation. The

proceedings before the trial court and before this court should be similarly limited. This is not to say, however, that the evidence relating to the proceedings taken in 1959, regardless of how they are denominated, is not relevant, material and competent on the issue presented. It was properly before the commissioner and the trial court and may be considered by this court for the light it throws on the issue of good faith.

The trial court found that the association renders service to its members by distributing to them bulletins containing information about changes in income tax laws, social security laws and information relative to the group insurance program, and in addition has continuously made contributions to Foster Parents Plan, Inc. since 1959. Petitioners assert that the foregoing findings, which are sustained by the evidence, are inconsistent with the finding which sustains respondent's order, and that they demonstrate as a matter of law that the association was maintained for purposes other than that of obtaining insurance for its members.

It must be conceded that the evidence and the findings do reflect without contradiction that the association had the ostensible purposes set forth in the amended articles which have been quoted earlier in the opinion, that three, and subsequently two directors have held directors' meetings at which they deliberated and took action on the foster parents' program, and that it has grown from expenditures of $180 per year to $1,800 per year; that the files reflect voluminous correspondence between the office of the association and organizations responsible for the foster parents' program, and with the orphans themselves; that eight general bulletins or letters were sent to the membership between the filing of the "restated" articles of incorporation in 1959 and March 1964, of which two dealt with the foster parents' plan, one with social security law amendments, one with income tax law amendments and the remainder with the insurance program.

The moving force in the change of name and purpose, whether called a formation or a stage in the maintenance of the association formerly known as the Solano Eagles Motorcycle Club, was an individual who was president of the company which subsequently issued the policies to the members of the association, and who was also president of the company which was first designated as agent for the insurance so written. He candidly stated that he was looking for a vehicle which would comply with the section of the Insurance Code that covers the point, and that the primary purpose of

forming the association was in order that he could write the insurance. The foster parents' program was instituted by his mother-in-law and carried on by his aunt who remained a director of the association, along with the attorney who had been requested to be a director and president.

The record further shows that the association has designated an agent to collect the dues as well as the premiums; that there has been no attempt to hold a meeting of the general membership since a scheduled meeting in 1961. In correspondence with the Treasury Department to secure a nonprofit charitable exemption, the president of the association acknowledged: "the chief benefits to our members come from being able to participate in group insurance programs which are made available by insurance companies only to organizations. We also supply information to them on various matters of current interest to employees, such as social changes and regulations." A resolution adopted November 14, 1962, recites: "RESOLVED, that the franchise disability program of the association has been beneficial to the association in that it has produced a substantial number of members, who have enabled the association to carry out the policies and programs which the Board of Directors desired."

The record shows that at the time of the hearing in 1964 the association had 4,000 to 5,000 members, that the insurance in force produced about $800,000 in gross premiums. There is no evidence to show that memberships are solicited other than in connection with applications for insurance to which the membership application is affixed. It was stated that there are members who have no insurance, but these members appear to be the two extant directors.

From the foregoing the respondent and the trial court were warranted in finding that the ostensible purposes of the association, other than that of obtaining insurance, were not pursued in good faith and that the association therefore failed to qualify under the applicable section.

Looking at the situation from a most charitable point of view it would appear that a directorate of two consisting of a president and a secretary is maintaining an association for charitable and service purposes for a group of 4,000 to 5,000 members, none of whom over a period of almost five years has demonstrated any interest in these ostensible purposes. The directors in order to raise money for these purposes have sold the franchise to solicit insurance and memberships to peti-

tioners' broker and administrator, and run the association on the funds so obtained.

The tail is now wagging the dog, the purpose of the association, even as manifested by the directorate, has become the underwriting of insurance in order to secure more and more revenue. The quest for purpose should not, however, cease with the articles of incorporation, the minutes of directors' meetings, or the charitable instincts of the two officers and directors. The purpose should be found in the collective mind of the 10 or more—4,000 to 5,000—members of the association who claim the right through the association to receive insurance at a discount. The record is barren of any collective purpose to participate in the activities on which petitioners rely.

It is not for this court to determine the wisdom or advisability of extending the right to selected group disability to any association regardless of the purpose for which it is formed or maintained. The references in the record to increased premiums, high underwriting costs, and the necessity of changing insurers suggest that there may be hazards in unlimited underwriting on this basis. Where, as here, the association has no purpose which attracts members other than insurance, it may well be argued that the underwriting costs of soliciting insurance and memberships is no less than soliciting the former alone, so no discount is warranted. These are matters of policy for determination by the Legislature. Until changes are made the courts can do no less than insist on a modicum of good faith.

The judgments are affirmed.

Sullivan, P. J., and Molinari, J., concurred.